# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **TO BE FILED UNDER SEAL** |
| v. | : Hon. Jessica S. Allen |
| THOMAS FARESE, | : Mag. No. 21-8049 |
| PAT TRUGLIA, | : |
| DOMENIC J. GATTO, JR., | : **CRIMINAL COMPLAINT** |
| NICHOLAS DEFONTE, AND | : |
| CHRISTOPHER CIRRI | : |

I, Katherine Latrenta, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this Complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached page and made a part hereof.

s// Katherine Latrenta
Katherine Latrenta, Special Agent
Federal Bureau of Investigation

Special Agent Latrenta attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(B)(2)(A) on this 21st day of April, 2021.

April 21, 2021, at  5:27 pm
District of New Jersey

Honorable Jessica S. Allen         s// Jessica S. Allen
United States Magistrate Judge    Signature of Judicial Officer

# ATTACHMENT A

## COUNT ONE
(Conspiracy to Commit Health Care Fraud)

From in or around October 2017 through in or around April 2019, in the District of New Jersey, and elsewhere, the defendants,

**THOMAS FARESE,
PAT TRUGLIA,
DOMENIC J. GATTO, JR.,
NICHOLAS DEFONTE, AND
CHRISTOPHER CIRRI,**

did knowingly and intentionally conspire and agree with each other and others to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of, a health care benefit program, as defined by 18 U.S.C. § 24(b), in connection with the delivery of or payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH FOUR
### (Health Care Fraud)

On or about the following dates, each constituting a separate count of this Complaint, in the District of New Jersey, and elsewhere, the defendants,

**THOMAS FARESE, AND
PAT TRUGLIA,**

did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of a health care benefit program, namely, Medicare and others, as defined by 18 U.S.C. § 24(b), in connection with the delivery of or payment for health care benefits, items and services:

| Count | Date |
|---|---|
| 2 | 07/17/2018 |
| 3 | 07/19/2018 |
| 4 | 01/30/2019 |

In violation of Title 18, United States Code, Section 1347 and Section 2.

## ATTACHMENT B

I, Katherine Latrenta, am a Special Agent with the Federal Bureau of Investigation. I have knowledge of the following facts based upon both my investigation and discussions with other law enforcement personnel and others. Because this affidavit is being submitted for the sole purpose of establishing probable cause to support the issuance of a complaint, I have not included each and every fact known to the government concerning this matter. Where statements of others are set forth herein, these statements are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## **BACKGROUND**

1. Since in or around 2017, the Department of Health and Human Services, Office of the Inspector General ("HHS-OIG") and the Federal Bureau of Investigation ("FBI") have been investigating a large-scale scheme to defraud the Medicare Program ("Medicare") and other federal and private payors through the paying and receiving of kickbacks in return for referrals of patients interested in certain medical services and products.

### **The Medicare Program**

2. Medicare is a federally-funded program established by the Social Security Act of 1965 (codified as amended in various sections of Title 42, United States Code) to provide medical insurance benefits for individuals age 65 and older and certain disabled individuals who qualify under the Social Security Act. Individuals who receive benefits under Medicare are referred to as "Medicare beneficiaries."

3. Medicare is administered by the Center for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

4. Medicare is divided into four parts, which help cover specific services: Part A (hospital insurance), Part B (medical insurance), Part C (Medicare Advantage), and Part D (prescription drug coverage).

5. Medicare Part B covers non-institutional care that includes physician services and supplies, such as durable medical equipment ("DME"), that are needed to diagnose or treat medical conditions and that meet accepted standards of medical practice.

6. Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affects commerce.

7. In order for a supplier of DME services to bill Medicare Part B, that supplier must enroll with Medicare as a Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") supplier by completing a Form CMS-855S.

8. As provided in the Form CMS-855S, to enroll as a DMEPOS supplier, every DMEPOS supplier must meet certain standards to obtain and retain billing privileges to Medicare, such as, but not limited to the following: (1) provide complete and accurate information on the Form CMS-855S, with any changes to the information on the form reported within 30 days; (2) disclose persons and/or organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations and program instructions, such as, but not limited to, the Federal Anti-Kickback Statute ("AKS") (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions; and (5) refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

9. Medicare-authorized suppliers of healthcare services, such as DMEPOS suppliers, can only submit claims to Medicare for reasonable and medically necessary services. Medicare will not reimburse claims for services that it knows are procured through kickbacks or bribes. Such claims are deemed false and fraudulent because they violate Medicare laws, regulations, and program instructions, as well as violating federal criminal law. For example, where a DME order is procured through the payment of a kickback in violation of the AKS, a claim to Medicare for reimbursement for that order is fraudulent. By implementing these restrictions, Medicare aims to preserve its resources, which are largely funded by United States taxpayers, for those elderly and other qualifying beneficiaries who have a genuine need for medical services.

10. Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits, only when certain requirements were met. These requirements included, among others: (a) that the beneficiary was located in a rural area (outside a metropolitan area or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio and video telecommunications system; and (c) that the beneficiary was at a licensed provider's office or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote provider.

11. Telehealth services could be covered by and reimbursable under Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed provider and were

reasonable and medically necessary to diagnose and treat a covered illness or condition.

## TRICARE

12.  TRICARE is a health care program of the United States Department of Defense ("DoD") Military Health System that provides coverage for DoD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors. The Defense Health Agency, an agency of the DoD, is the military entity responsible for overseeing and administering the TRICARE program.

13.  TRICARE is a "health care benefit program," as defined by Title 18 United States Code § 24(b), and a "Federal health care program," as defined by Title 42 United States Code § 1320a-7b(f), that affects commerce.

## CHAMPVA

14.  The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") is a federal health benefit program within the Department of Veterans Affairs ("VA"). CHAMPVA is a comprehensive health care program in which the VA shares the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-rated service-connected disability.

15.  In general, the CHAMPVA program covers most health care services and supplies that are medically and psychologically necessary. CHAMPVA is always the secondary payer to Medicare and reimburses beneficiaries for costs that Medicare does not cover. Health care claims must have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

16.  CHAMPVA is a "health care benefit program," as defined by Title 18 United States Code § 24(b), and a "Federal health care program," as defined by Title 42 United States Code § 1320a-7b(f), that affects commerce.

17.     As described more fully below, from at least as early as in or around October 2017 through in or around April 2019, defendants THOMAS FARESE, PAT TRUGLIA, DOMENIC J. GATTO, JR., NICHOLAS DEFONTE, and CHRISTOPHER CIRRI each played a role in a scheme to defraud health care benefit programs by offering, paying, soliciting, and receiving kickbacks and bribes in exchange for completed doctors' orders for DME ("DME Orders"), which were subsequently fraudulently billed to Medicare and other health care benefit programs. As the term was used during the course of the scheme, a DME Order was comprised of the name of a patient covered by one or more health care benefit or private insurance programs, as well as that patient's contact information, insurance details, and a doctor's order or prescription for DME for that particular patient.  A DME Order amounted to a guarantee that the patient's prescription would be reimbursed by Medicare or other federal or private health care programs. In many instances, DME Orders procured and submitted by the defendants lacked any medical necessity, compounding the fraudulent nature of their submission for reimbursement.

## The DME Companies and Owners

18.     At all times relevant to this Complaint:

a. Coconspirator-1 ("CC-1") and Coconspirator-2 ("CC-2") were each residents of New Jersey who owned, operated, and/or had financial or controlling interests in numerous DME supply companies located in New Jersey and elsewhere (collectively, the "CC-1/CC-2 DME Companies"), including each of the DME companies described in the paragraphs below. The CC-1/CC-2 DME Companies primarily supplied DME such as knee, ankle, back, wrist, and shoulder braces to beneficiaries of both federally-funded and privately-funded health care benefit programs.

b. Along with CC-1 and CC-2, defendants FARESE, TRUGLIA, GATTO, and others owned and/or had financial interests in several of the CC-1/CC-2 DME Companies and used those DME companies to fill DME Orders and collect the reimbursements. The DME Orders were provided to the CC-1/CC-2 DME Companies by defendants DEFONTE, CIRRI, TRUGLIA, and others, who expected and received kickbacks in return for every DME Order that resulted in reimbursement from Medicare and other health care benefit programs.

c. Defendant TRUGLIA was a resident of Florida. Together with CC-1 and CC-2, defendant TRUGLIA owned and/or had a financial interest in DME Company-1, a DME supply company located in Georgia. DME Company-1 was a registered DMEPOS supplier with Medicare. Although the Form CMS-855S that was submitted to Medicare on behalf of DME Company-1 listed Nominee Owner-1 as its owner, in reality, defendant TRUGLIA, CC-1, and CC-2, owned and operated DME Company-1 outside of the knowledge of Medicare.

d. Defendant TRUGLIA also provided DME Orders to the CC-1/CC-2 DME Companies in exchange for kickback payments.

e. Defendant FARESE was a resident of Florida. Together with CC-1 and CC-2, defendants TRUGLIA and FARESE owned and/or had a financial interest in DME Company-2, a DME supply company located in Florida. DME Company-2 was a registered DMEPOS supplier with Medicare. Although the Form CMS-855S that was submitted to Medicare on behalf of DME Company-2 listed Nominee Owner-2 as its owner, in reality, defendant TRUGLIA, defendant FARESE, CC-1, and CC-2, owned and operated DME Company-2 outside of the knowledge of Medicare.

f. Defendants DEFONTE and CIRRI were each residents of New Jersey. Defendants DEFONTE and CIRRI jointly owned, operated, and/or had a financial interest in various entities located in New Jersey that conducted business with the CC-1/CC-2 DME Companies (collectively, the "CIRRI/DEFONTE DME Order Supply Companies"). The role of the CIRRI/DEFONTE DME Order Supply Companies was to provide DME Orders to the CC-1/CC-2 DME Companies in exchange for kickback payments.

g. Defendant GATTO was a resident of Florida. Together with CC-1, CC-2, and others, defendant GATTO owned and/or had a financial interest in DME Company-3 and DME Company-4, DME supply companies located in New Jersey and Georgia, respectively. DME Company-3 and DME Company-4 were registered DMEPOS suppliers with Medicare. Although the Form CMS-855Ss that were submitted to Medicare on behalf of DME Company-3 and DME Company-4 stated that they were controlled by certain nominee owners, in reality, defendant GATTO, CC-1, and CC-2, owned and operated DME Company-3 and DME Company-4 outside of the knowledge of Medicare.

h. In addition to owning a share of DME Company-3 and DME Company-4, defendant GATTO owned, operated, and/or had a financial or controlling interest in a shell company located in Florida that defendant GATTO held out as a legitimate company (the "GATTO Shell Company"). To conceal his involvement in the scheme, defendant GATTO funneled funds and deposited illicit profits from DME Company-3 and DME Company-4 through the GATTO Shell Company.

i. Defendant GATTO also owned, operated, and/or had a financial or controlling interest in a pharmacy benefits management company ("PBM-1").

## **OVERVIEW OF THE CONSPIRACY**

19. Starting as early as in or around February 2015, CC-1 and CC-2 began purchasing and establishing the CC-1/CC-2 DME Companies in New Jersey and elsewhere. Each of the CC-1/CC-2 DME Companies was enrolled with Medicare to be reimbursed for legitimate DME claims. As described above, each of the CC-1/CC-2 DME Companies certified that any claim thereafter submitted to Medicare for reimbursement complied with the relevant laws, regulations, and program instructions.

20. Starting as early as in or around March 2018, defendants FARESE, TRUGLIA, and GATTO began purchasing ownership stakes in several of the CC-1/CC-2 DME Companies. To conceal their involvement in the scheme, defendants FARESE, TRUGLIA, GATTO knew that the names of nominee owners were utilized and provided to Medicare on the Form CMS-855Ss in lieu of their own.

21. In order to ensure that their DME companies would receive a steady flow of reimbursement money from Medicare and other health care programs, defendants FARESE, TRUGLIA, GATTO, CC-1, and CC-2 conspired to enter into kickback agreements with individuals who could regularly supply them with DME Orders (collectively, "Suppliers"). At various times during the scheme, defendants TRUGLIA, DEFONTE, and CIRRI each acted as individual Suppliers and procured DME Orders for the scheme in return for kickback payments.

22. To generate DME Orders, Suppliers like defendants TRUGLIA, DEFONTE, and CIRRI first identified qualified beneficiaries located in New Jersey and elsewhere through the use of marketing call centers under their direction. Once beneficiaries were identified by the marketers, the Suppliers utilized the services of telemedicine companies to secure corresponding orders for DME, regardless of whether that DME was medically justified for the beneficiary. Once prepared, the Suppliers transmitted the completed DME Orders to the CC-1/CC-2 DME Companies for processing. The CC-1/CC-2 DME Companies paid the Suppliers kickbacks ranging from approximately $160 to $385 in exchange for each DME Order. The CC-1/CC-2 DME Companies then arranged for the prescribed DME, such as orthotic braces, to be shipped to the individual beneficiaries. Finally, the CC-1/CC-2 DME Companies submitted or caused to be submitted DME reimbursement claims to Medicare, TRICARE, CHAMPVA, and other federal and private health care benefit programs.

23. From in or around March 2018 through in or around April 2019, defendants FARESE, TRUGLIA, GATTO, CC-1, and CC-2, paid a total of approximately $15,500,000 in kickbacks to defendants TRUGLIA, CIRRI, and DEFONTE for DME Orders supplied to the CC-1/CC-2 DME Companies. During approximately that same period, Medicare, TRICARE, and CHAMPVA reimbursed the CC-1/CC-2 DME Companies at least approximately $49,000,000 for

fraudulent DME claims based on DME Orders supplied by defendants TRUGLIA, CIRRI, and DEFONTE.

## THE DEFENDANTS' ROLES IN THE CONSPIRACY

### *Defendants TRUGLIA and FARESE*

24. In or around October 2017, defendant TRUGLIA was already engaged in a kickback scheme involving DME Orders with another co-conspirator ("CC-3"). CC-3 then introduced defendant TRUGLIA to CC-1 so defendant TRUGLIA could continue his scheme. Shortly after they were introduced, CC-1 traveled to Florida to meet defendant TRUGLIA. During their meeting, defendant TRUGLIA and CC-1 discussed, among other things, the above-described scheme involving the CC-1/CC-2 DME Companies. CC-1 and defendant TRUGLIA agreed that defendant TRUGLIA would procure DME Orders for the CC-1/CC-2 DME Companies, and that he would be paid approximately $300 for each DME Order for a back brace, $200 for each DME Order for a knee or shoulder brace, and $100 for each DME Order for a wrist or ankle brace. Shortly thereafter, defendant TRUGLIA began to provide DME Orders to the CC-1/CC-2 DME Companies.

25. To obtain the DME Orders, defendant TRUGLIA entered into kickback arrangements with marketing call centers and telemedicine companies. For example, defendant TRUGLIA entered into a kickback arrangement with Telemedicine Owner-1, who owned, operated, and/or had a financial interest in a telemedicine company ("Telemedicine Company-1"). Telemedicine Company-1, among other things, hired doctors and nurse practitioners who were enrolled in Medicare as health care providers and could therefore write orders for DME that would be reimbursed by Medicare. Defendant TRUGLIA agreed to pay Telemedicine Owner-1 approximately $90 for each DME Order that Telemedicine Owner-1 provided to defendant TRUGLIA. Telemedicine Owner-1, in turn, arranged to pay healthcare providers under his/her control approximately $30 per consultation that resulted in a DME Order. Defendant TRUGLIA paid Telemedicine Company-1 in excess of approximately $1.2 million for DME Orders.

26. To conceal and disguise the scheme, TRUGLIA and Telemedicine Owner-1 entered into sham contracts labeling payments for the purchasing of completed doctors' orders as "marketing" or "business process outsourcing" (BPO) expenditures, creating false and fraudulent invoices, and by using shell companies and bank accounts to obscure the payments to Telemedicine Company-1. To reinforce the appearance that Suppliers were paying for BPO Services rather than doctors' orders, the Call Center Company emailed invoices to Suppliers for $25 per hour. The emails attaching the invoices, however, clarified that the BPO hours were "the fair market value equivalent" of "consults" at a four-to-one rate. The invoices fraudulently made it appear that defendant

TRUGLIA paid for four hours of BPO services at $25 each, in order to disguise that they were paying an illegal kickback of approximately $100 for each doctors' consultation.

27. To account for those DME Orders for which he expected to be paid a kickback, defendant TRUGLIA sent written messages to CC-1 and CC-2 outlining the payments owed to him. For example, on or about May 24, 2018, defendant TRUGLIA sent a text message to CC-1 stating that he was owed approximately $36,600 in kickbacks for approximately 226 DME Orders provided to the CC-1/CC-2 DME Companies that day, bringing the "running total" of kickbacks he was owed to date up to approximately $159,100.

28. In this manner, from in or around October 2017 through in or around April 2019, defendant TRUGLIA received kickbacks of approximately $7,693,925 for DME Orders provided to the CC-1/CC-2 DME Companies. As a result of the kickback scheme, Medicare, TRICARE, and CHAMPVA paid the CC-1/CC-2 DME Companies approximately $32,000,000 in reimbursements for the DME Orders that were procured by defendant TRUGLIA.

29. In or around early 2018, defendant TRUGLIA wanted to purchase an ownership interest in DME Company-1, one of the CC-1/CC-2 DME Companies. In lieu of a cash investment, defendant TRUGLIA agreed to provide CC-1 and CC-2 with approximately $200,000 worth of DME Orders in exchange for an ownership percentage interest in DME Company-1.

30. Like the other CC-1/CC-2 DME Companies, DME Company-1 received DME Orders from defendant TRUGLIA and other Suppliers pursuant to kickback arrangements negotiated with those Suppliers. As a result of the scheme, Medicare, TRICARE, and CHAMPVA paid DME Company-1 at least approximately $5,896,428 in reimbursements for fraudulent DME Orders.

31. In addition to receiving kickback payments for supplying DME Orders to the CC-1/CC-2 DME Companies, defendant TRUGLIA received distributions of proceeds from DME Company-1 due to his ownership stake. For example, from between in or around April 2018 and April 2019 defendant TRUGLIA received approximately $900,000 in fraudulently obtained profits from DME Company-1.

32. In or around April 2018, CC-1 continued to seek partners who would be willing to invest in the scheme in return for a share of its profits. To that end, defendant TRUGLIA introduced defendant FARESE to CC-1 as a potential partner who was willing to establish new DME companies. During one or more meetings between defendant TRUGLIA, CC-1, and defendant FARESE, defendant FARESE learned of the scheme and agreed to invest. On or about May 31, 2018, defendant TRUGLIA sent a message to CC-1 confirming that defendant FARESE and defendant TRUGLIA would agree to evenly split ownership with CC-1 in a

new entity, DME Company-2. Defendant TRUGLIA stated, "50/50 and it's done … And we bring more than $ to the table as u know[.] You have a real friend for life." Thereafter, in or around June 2018, defendant FARESE and defendant TRUGLIA invested approximately $500,000 into DME Company-2.

33.  As described previously, to evade detection, defendants FARESE and TRUGLIA, CC-1, and CC-2 concealed from Medicare their ownership, financial, and/or controlling interest in DME Company-2 by falsely reporting Nominee Owner-2 on the Form CMS-855S while omitting their own names. In exchange for serving as the nominee owner, Nominee Owner-2 was provided a monthly cash payment of approximately $10,000. On or about June 15, 2018, CC-1 sent a message to defendant TRUGLIA seeking assurance that defendant FARESE knew that CC-1 was "taking … $10K for [Nominee Owner-2] right[?]" Defendant TRUGLIA responded, "100%."

34.  Like the other CC-1/CC-2 DME Companies, DME Company-2 received DME Orders from defendant TRUGLIA and other Suppliers pursuant to kickback arrangements. Defendant FARESE was informed of how much his coconspirators were spending on kickbacks. For example, on or about June 22, 2018, defendant TRUGLIA sent a message to CC-1 that "I'm having my weekly meeting with Tommy [FARESE]. All the same on account, or anything I should let him know?" CC-1 responded, "All same[.] Will be spending $50-75k next week [on DME Orders]."

35.  From in or around June 2018 through in or around April 2019, defendants FARESE and TRUGLIA used DME Company-2 to submit or cause to be submitted the following fraudulent claims for reimbursement:

   a. On or about July 17, 2018, DME Company-2 submitted approximately four claims to Medicare for eight braces for Beneficiary-1, a Medicare beneficiary who resided in New Jersey. The claims were based on DME Orders provided by one of the Suppliers in exchange for kickbacks. Medicare subsequently paid DME Company-2 approximately $3,325.53 in reimbursement for the fraudulent claims.

   b. On or about July 19, 2018, DME Company-2 submitted approximately four claims to Medicare for eight braces for Beneficiary-2, a Medicare beneficiary who resided in New Jersey. The claims were based on DME Orders provided by one of the Suppliers in exchange for kickbacks. Medicare subsequently paid DME Company-2 approximately $3,182.05 in reimbursement for the fraudulent claims.

   c. On or about January 30, 2019, DME Company-2 submitted approximately three claims to Medicare for six braces for

Beneficiary-3, a Medicare beneficiary who resided in New Jersey. The claims were based on DME Orders provided by defendant TRUGLIA in exchange for kickbacks. Medicare subsequently paid DME Company-2 approximately $2,027.38 in reimbursement for the fraudulent claims.

36. As a result of the scheme, from in or around June 2018 through in or around April 2019, Medicare, TRICARE, and CHAMPVA paid DME Company-2 approximately $2,869,751 in reimbursements for fraudulent DME Orders. From between in or around August 2018 and April 2019, defendants FARESE and TRUGLIA received approximately $730,000 in profits from the scheme for DME Orders passed through DME Company-2. Defendant TRUGLIA also received approximately $640,000 in kickbacks from CC-1 and CC-2 (through DME Company-2) in exchange for providing DME Company-2 with DME Orders.

### *Defendants GATTO, DEFONTE, and CIRRI*

37. In or around December 2017, another coconspirator interested in joining the scheme ("CC-4") had a discussion with CC-1 about getting involved. During their meeting, CC-1 explained to CC-4 how the scheme operated. Thereafter, CC-4 contacted defendant GATTO, who had previous experience in the healthcare industry as a result of his ownership of PBM-1 and other business ventures. Defendant GATTO was made aware of the scheme with CC-1 and how it worked, and thereafter, agreed to join. During the course of the scheme, defendant GATTO also communicated with CC-1 directly to discuss how the scheme would operate, and to negotiate his share of the profits.

38. Defendant GATTO and CC-4 also had a relationship with defendants CIRRI and DEFONTE. As described above, defendants CIRRI and DEFONTE were Suppliers with access to telemarking and telemedicine companies and were able to procure DME Orders. In or around March 2018, defendant GATTO and CC-4 introduced defendants CIRRI and DEFONTE to CC-1 as potential Suppliers for the CC-1/CC-2 DME Companies. At a meeting in or around March 2018, defendants CIRRI and DEFONTE agreed to provide DME Orders for the scheme in return for approximately $265 in kickbacks for each DME Order procured. Shortly thereafter, the CIRRI/DEFONTE DME Order Supply Companies began to provide DME Orders to the CC-1/CC-2 DME Companies. For making the introduction, defendant GATTO and CC-4 agreed to receive a kickback of approximately $30 (and later, $10), for each DME Order that the CIRRI/DEFONTE DME Order Supply Companies provided to the CC-1/CC-2 DME Companies.

39. As mentioned above, defendants CIRRI and DEFONTE utilized the CIRRI/DEFONTE DME Order Supply Companies to work with marketing call centers and telemedicine companies to generate DME Orders for the scheme. The DME Orders procured by the CIRRI/DEFONTE DME Order Supply

Companies were the product of a kickback arrangement as well. Specifically, defendants CIRRI and DEFONTE entered into a kickback arrangement with Telemedicine Owner-2, the owner of two telemedicine companies ("Telemedicine Company-2" and "Telemedicine Company-3") to use the doctors and nurse practitioners employed by those companies to write orders for DME. After Telemedicine Owner-2 was provided with the personal identifying information of qualified patient beneficiaries, defendants CIRRI and DEFONTE agreed to pay Telemedicine Owner-2 approximately $90 for each DME order that Telemedicine Owner-2 provided for those beneficiaries. Telemedicine Owner-2, in turn, arranged to the pay healthcare providers under his/her control approximately $30 per consultation that resulted in a DME order. The CIRRI/DEFONTE DME Order Supply Companies paid Telemedicine Companies-2 and 3 in excess of approximately $3.3 million for DME Orders.

40. After obtaining DME Orders, defendants CIRRI and DEFONTE transmitted (or caused to be transmitted) the DME Orders to the CC-1/CC-2 DME Companies for processing. Defendants CIRRI and DEFONTE were paid a kickback for each DME Order that resulted in reimbursement from a paying health plan.

41. To conceal the nature of the kickback payments they were receiving, defendants CIRRI and DEFONTE submitted sham invoices to the CC-1/CC-2 DME Companies that intentionally mischaracterized the nature of the payments. Specifically, the invoices sent by CIRRI/DEFONTE DME Order Supply Companies billed the CC-1/CC-2 DME Companies for marketing and business processing outsourcing ("BPO") services on an hourly basis, when, in reality, the payments were being made on a per-DME Order basis.

42. For example, on or about May 24, 2018, defendant DEFONTE sent an invoice and spreadsheet to the CC-1/CC-2 DME Companies, copying defendant CIRRI. According to the spreadsheet, the CIRRI/DEFONTE DME Order Supply Companies provided approximately 243 DME Orders to the CS-1/CS-2 DME Companies from on or about May 18, 2018 through May 24, 2018, and were owed approximately $54,590 for those DME Orders. However, according to the corresponding invoice from the same date, the approximately $54,590 owed to the CIRRI/DEFONTE DME Order Supply Companies was for "BPO Expences [sic]" of $19,070 and "Marketing" expenses of $35,590.

43. In this manner, from in or around March 2018 through in or around April 2019, defendants CIRRI and DEFONTE received kickbacks of approximately $7,850,545 for DME Orders provided to the CC-1/CC-2 DME Companies. The CIRRI/DEFONTE DME Order Supply Companies, in turn, paid kickbacks of approximately $157,000 to defendant GATTO and CC-4. As a result of the kickback scheme, Medicare, TRICARE, and CHAMPVA paid the CC-1/CC-2 DME Companies approximately $17,000,000 in reimbursements for the DME

Orders that were procured by defendants CIRRI and DEFONTE through the CIRRI/DEFONTE DME Order Supply Companies.

44. In or around May 2018, defendant GATTO expressed an interest in purchasing an ownership stake in a DME company, like defendants TRUGLIA and FARESE had done. Defendant GATTO provided CC-1 with approximately $290,000 in cash in exchange for an ownership percentage interest in DME Company-4. To conceal his interest in DME Company-4, defendant GATTO, CC-1, and CC-2 utilized a nominee owner name on the Form CMS-855Ss submitted to Medicare. Moreover, defendant GATTO did not directly transfer his investment money to DME Company-4, but instead funneled the payment through one or more shell companies under his control to conceal the source of the funds. Defendant GATTO purchased investment interests in approximately one other DME company (collectively, "the GATTO DME Companies"), and took measures to conceal his involvement as he did with DME Company-4.

45. Like the other CC-1/CC-2 DME Companies, the GATTO DME Companies entered into kickback arrangements with Suppliers including the CIRRI/DEFONTE DME Order Supply Companies, defendant TRUGLIA, and others in order to obtain DME Orders for reimbursement. As a result of the scheme, Medicare, TRICARE, and CHAMPVA paid the GATTO DME Companies at least approximately $5,390,458 in reimbursements for fraudulent DME Orders.

46. Given his ownership interest, defendant GATTO also received distributions of proceeds from the GATTO DME Companies. For example, from between in or around May 2018 and April 2019, the GATTO DME Companies funneled approximately $864,432 in profits from the scheme through the GATTO Shell Company and other entities, for defendant GATTO and CC-4's benefit.